23CA1309 & 23CA1317 Peo v Gallegos 05-28-2026

COLORADO COURT OF APPEALS

---

Court of Appeals Nos. 23CA1309 & 23CA1317
Jefferson County District Court No. 14CR2322
Honorable Tamara S. Russell, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Scott Alan Gallegos,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE WELLING
Schock and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 28, 2026

---

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jeffrey A. Wermer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Scott Alan Gallegos, appeals the judgment of conviction for one count of first degree assault, one count of second degree assault, and two counts of reckless endangerment.  Because we conclude that the trial court's refusal to instruct the jury on Gallegos' defense of a third person affirmative defense impermissibly lowered the prosecution's burden of proof for the first degree assault charge, and likely substantially influenced the remaining verdicts, we reverse the judgment of conviction and remand to the trial court for a new trial.

I.     Background

¶ 2     In 2014, Gallegos and his girlfriend, J.W., took their motorcycles for a test drive after working on them for most of the day.  Gallegos brought some of his tools with him, including a crescent wrench.  They ended their test drive at a local karaoke bar to meet up with some friends.

¶ 3     They both sat facing away from the bar, with J.W. sitting to Gallegos' right.  Another patron, Dennis Shing, approached J.W., introduced himself, and also sat facing away from the bar to her right.  J.W. and Shing engaged in small talk while Gallegos watched karaoke performances.

¶ 4     J.W. testified that at some point during their conversation, Shing "poked" J.W.'s breast.  J.W. then stood up and told her friend that she wanted to leave the bar.  J.W. testified that before she walked away, she told Gallegos that Shing had just touched her and that she was leaving the bar.

¶ 5     Upon hearing that Shing had touched J.W., Gallegos pulled his crescent wrench out of his pocket and hit Shing in the eye and jaw with it.  As Shing moved away, Gallegos kicked him from behind.  Gallegos struck Shing with the wrench at least one more time from behind before Shing exited the bar and called 911.

¶ 6     As Shing exited the bar, Matt McDermott, Shing's friend, grabbed Gallegos from behind.  Gallegos' friend pulled McDermott off Gallegos and onto the ground, such that McDermott was lying face up on the ground.  According to Gallegos, McDermott kicked at him from the ground, so Gallegos hit McDermott with the wrench to keep him down.  After the altercation, Gallegos exited the bar and drove his motorcycle home.

¶ 7     Gallegos was charged with one count of assault in the first degree, pursuant to section 18-3-202(1)(a), C.R.S. 2025, for his conduct toward Shing, and one count of assault in the second

2

degree, pursuant to section 18-3-203(1)(b), C.R.S. 2025, for his conduct toward McDermott.

¶ 8    At trial, the prosecution admitted video footage of the attack. The video shows the entire incident, without audio, from two different, slightly obscured, angles.  The video shows Shing approaching J.W. and chatting with her, then J.W. standing up from her barstool and speaking to Gallegos.  In the video, J.W. is still in between Gallegos and Shing when Gallegos begins to pull the wrench out of his pocket.

¶ 9    J.W. testified that she is sensitive to people invading her personal space because she was a victim of sexual assault as a child.  She also testified that Gallegos is aware of this sensitivity. And she testified that when Shing "poked" her breast, she was "shocked" and uncomfortable, and it made her want to leave the bar.

¶ 10    Gallegos testified that he was aware of J.W.'s history with sexual assault and that "she don't like people touching her."  He also testified that when J.W. told him that Shing had touched her, "[s]he looked a little bit stunned," and even though he didn't see it happen, he understood that to mean Shing was "inappropriately

3

touching [J.W.], like groping." Gallegos stated that after J.W. told him that Shing had touched her, he saw her walk away. Gallegos admitted to attacking Shing and McDermott with his wrench but stated that he "was just trying to, you know, protect [J.W.]." Further, Gallegos testified that he didn't hit Shing "with full force" because he wasn't trying to hurt Shing; instead, he was trying to "scare him" and get him out of the bar.

¶ 11    An Arvada police officer who responded to the 911 call testified that upon arriving at the scene, he observed that Shing's left eyelid was bleeding and swollen, his bottom lip was bleeding, and there was a lump on the side of his head behind his left ear. Shing testified that his eyelid was cut open and the injury required stitches.

¶ 12    Gallegos, through his counsel, requested that the jury be instructed on the lesser counts of reckless endangerment of both Shing and McDermott.[1] The court granted this request.

---

[1] At trial, counsel and the trial court referred to these counts as "lesser nonincluded" offenses. Both Gallegos' and the People's briefs refer to these charges as "lesser included" offenses. Due to our disposition, we don't resolve this conflict.

4

¶ 13    Gallegos also requested that the jury be instructed on the defense of a third person affirmative defense for the charge of first degree assault against Shing. He also asked to include the defense of a third person defense on the jury instructions for reckless endangerment of Shing as an elemental traverse. Specifically, Gallegos' counsel argued that the instruction was warranted because Gallegos testified that he attacked Shing to protect J.W. The trial court refused to give the jury a defense of a third person affirmative defense instruction:

> The testimony is clear that there was no discussion of unlawful physical force by Dennis Shing. There was an allegation of an unlawful touching, which would have been unlawful if it were sexual in nature. However, I don't think this defense of person is getting at it to protect someone from unlawful physical force. As we've seen in the video and heard in the testimony from all witnesses, [J.W.] had already gotten up and started to walk away before Mr. Gallegos picked up his wrench and struck Mr. Shing. He was, by Mr. Gallegos's own admission, not keeping Mr. Shing from harming [J.W.]. It was more of a response.
>
> So I don't believe that this is an appropriate affirmative defense, and I'm going to mark it as denied by the Court.

¶ 14    The trial court did, however, grant Gallegos' request to instruct the jury on a self-defense affirmative defense for the charge of second degree assault and reckless endangerment against McDermott.  This jury instruction included the initial aggressor exception to the self-defense affirmative defense — instructing the jury that Gallegos wasn't acting in self-defense if it found that he was the initial aggressor.

¶ 15    Ultimately, the jury found Gallegos guilty of all four counts — the charged counts and added counts.

¶ 16    The trial court sentenced Gallegos to ten years in the custody of the Department of Corrections for the first degree assault conviction, to be served consecutively with an eight-year sentence for the second degree assault conviction.  The trial court also imposed thirty-day sentences for each reckless endangerment charge, to be served concurrently, which had already been served through presentence confinement.

## II.    Analysis

¶ 17    On appeal, Gallegos contends that the trial court erred in six ways.  Specifically, he contends that the trial court erred by (1) denying Gallegos' request to instruct the jury on his defense of a

6

third person affirmative defense; (2) failing to sua sponte instruct the jury on the presence of multiple assailants when it instructed the jury on Gallegos' self-defense affirmative defense; (3) improperly instructing the jury on the provocation exception to his self-defense affirmative defense; (4) failing to sua sponte intervene in alleged prosecutorial misconduct during closing arguments; (5) failing to merge the reckless endangerment convictions into the greater first and second degree assault convictions; and (6) committing cumulative error. We agree that the trial court erred in refusing to instruct the jury on Gallegos' defense of a third person affirmative defense. Because we conclude that this error impermissibly lowered the prosecution's burden of proof for the first degree assault charge and the error likely substantially influenced the other verdicts, we reverse the judgment on this basis without addressing the remining issues.

## A.    Defense of a Third Person

¶ 18    Gallegos contends that the trial court erred when it refused to instruct the jury on his defense of a third person affirmative defense for the first degree assault of Shing. We agree.

### 1. Standard of Review and Applicable Law

¶ 19 We review de novo whether sufficient evidence supports giving a defense of a third person jury instruction. *People v. Wakefield,* 2018 COA 37, ¶ 8. When an affirmative defense jury instruction is appropriate, the affirmative defense is treated as an additional element of the charged offense. *Galvan v. People,* 2020 CO 82, ¶ 21. If a trial court erroneously refuses to give an affirmative defense instruction, then the prosecution wasn't required to prove all the necessary elements and "the prosecution's burden of proof has been impermissibly lowered, implicating a defendant's constitutional rights." *Pearson v. People,* 2022 CO 4, ¶ 16. Accordingly, such an error is subject to constitutional harmless error review. *Id.* These errors require reversal if "there is a reasonable *possibility* that the [error] might have contributed to the conviction." *Hagos v. People,* 2012 CO 63, ¶ 11 (quoting *Chapman v. California,* 386 U.S. 18, 23 (1967)).

¶ 20 A trial court has a duty to correctly instruct the jury on the law applicable to the case. *People v. Stewart,* 55 P.3d 107, 120 (Colo. 2002). A defendant is entitled to an affirmative defense jury instruction when he or she raises some credible evidence to support

8

it. § 18-1-407(1), C.R.S. 2025. "The 'some credible evidence' standard requires little evidence for submitting an affirmative defense to the jury." *O'Shaughnessy v. People*, 2012 CO 9, ¶ 12. This quantum of proof is satisfied if there is *any* evidence supporting the defense theory in the record, "even highly improbable testimony by the defendant." *Stewart*, 55 P.3d at 120; *see People v. York*, 897 P.2d 848, 850 (Colo. App. 1994).

¶ 21  "When considering whether a defendant is entitled to requested instructions, we consider the evidence in the light most favorable to the defendant." *Cassels v. People*, 92 P.3d 951, 955 (Colo. 2004).

¶ 22  Colorado's defense of a third person statute provides:

> [A] person is justified in using physical force upon another person in order to defend . . . a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

§ 18-1-704(1), C.R.S. 2025.

## 2.  Application

¶ 23  At trial, Gallegos requested a defense of a third person jury instruction for his theory that he attacked Shing to defend J.W.

from further unwanted and uninvited sexual contact. To be entitled to the affirmative defense jury instruction, Gallegos needed to provide some credible evidence showing that (1) he acted in defense of J.W.; (2) based on a reasonable belief that Shing was using or imminently going to use unlawful physical force on J.W.; and (3) Gallegos used a degree of force he reasonably believed to be necessary for such a purpose. *See* § 18-1-407(1); § 18-1-704(1)(a). We will address these elements, and the evidence in the record that satisfies each, in turn below.

   a.   Evidence that Gallegos Acted in Defense of J.W.

First, there is some evidence in the record that Gallegos attacked Shing in defense of J.W. When he was asked about what he did to Shing, Gallegos responded that he "was just trying to, you know, protect her." While this may be thin, the quantum of proof required to provide a jury instruction on the defendant's affirmative defense theory is low. *See Galvan*, ¶ 24 (The "some credible evidence" standard is interchangeable with "some evidence," "any evidence," "a scintilla of evidence," and a "small quantum of evidence."). Further, any evidence is sufficient even if it is "highly improbable testimony by the defendant." *Stewart*, 55 P.3d at 120.

10

Accordingly, there is sufficient evidence in the record to support that Gallegos was acting in defense of J.W.

### b. Evidence of Gallegos' Reasonable Belief of Shing's Use or Imminent Use of Unlawful Physical Force

¶ 25 Next, we consider whether there was some credible evidence that Gallegos had a reasonable belief that Shing was using or imminently going to use unlawful physical force against J.W.

¶ 26 The defense of a third person affirmative defense doesn't require actual knowledge of all circumstances surrounding imminent danger — it only requires a *reasonable belief* of the necessity to intervene to prevent injury to a third person. *People v. Silva*, 987 P.2d 909, 916 (Colo. App. 1999). This is because the defendant's reasonable belief is the "touchstone" of a defense of a third person defense. *People v. Suazo*, 867 P.2d 161, 169 (Colo. App. 1993). The defense of a third person statute considers both the reasonable belief and the actual belief of the defendant. *See People v. Jones*, 2023 COA 104, ¶ 26.

¶ 27 First, the People argue that Shing's "poke" of J.W. wasn't necessarily unlawful physical force because that conclusion requires an unreasonable assumption that the poke was sexual in

11

nature.  It's undisputed that subjecting a person to unwanted sexual contact is a crime.  *See* § 18-3-404(1)(a), C.R.S. 2025 (statute defining the crime of unlawful sexual contact).  So, if the "poke" was sexual in nature, it would qualify as unlawful physical force.

¶ 28     There was ample evidence presented at trial that Shing's contact with J.W. was unwanted sexual contact.  J.W. testified that Shing touched her breast and that it left her in shock and prompted her to leave the bar.  Gallegos testified that J.W. had told him that Shing had touched her, that he was aware of her sensitivity to unwanted contact, and that he perceived her to be "stunned."  Gallegos further testified that he understood Shing's touch was "inappropriately touching, *like groping*."  (Emphasis added.)

¶ 29     It's of no moment that when J.W. told Gallegos that Shing had touched her, she didn't specify that Shing had touched her breast or that it was unwanted contact.  After all, Gallegos wasn't required to know all the circumstances of the perceived threat to be entitled to a defense of a third person jury instruction.  *See Silva*, 987 P.2d at 916.  What matters was his actual and reasonable belief of a perceived threat.  *See Suazo*, 867 P.2d at 169.  And Gallegos'

12

testimony is evidence that he held an actual belief that Shing had made unwanted sexual contact with J.W. Further, it's reasonable to assume a touch was unwanted sexual contact when a person with sensitivity to sexual contact says they were touched and acts "stunned."

¶ 30    While the People argue that we can't assume that this contact was sexual in nature, the standard for evaluating if evidence supports the giving of an affirmative defense jury instruction requires us to draw reasonable inferences in favor of the defendant. *Cassels*, 92 P.3d at 955. Viewing this evidence in the light most favorable to Gallegos, we conclude that there is some credible evidence to support that Gallegos reasonably believed that Shing's "poke" was sexual in nature and, thus, unlawful physical force. *See id.*

¶ 31    Next, we turn to whether Gallegos had an actual and reasonable belief that Shing's unlawful physical force was imminent. The trial court rejected Gallegos' requested defense of a third person jury instruction based on its perception of the evidence that there was no imminent threat of further unlawful physical force because the moment had passed and J.W. was walking away.

The People adopt this argument on appeal for why Gallegos'
conviction must stand. We disagree.

¶ 32    Colorado courts haven't defined "imminent" in the defense of a
third person context but have in the choice of evils context. *Suazo*,
867 P.2d at 169 (a division of this court used the definition of
"imminent" used in choice of evils jury instructions to evaluate
whether the defendant was entitled to a self-defense jury
instruction). There, "imminent" is defined as "near at hand,
impending or on the point of happening," and "likely to happen
without delay." *Id.* (citations omitted). We will use this definition
for our analysis.

¶ 33    The People argue that because J.W. had stood up and started
to leave when Gallegos attacked Shing, "the only reasonable
inference was that [Gallegos] acted in retaliation rather than
defense." We, however, don't view the evidence as being so clear
cut. Yes, the video footage shows that J.W. had already stood up
from her barstool before Gallegos attacked Shing. But the video
footage can also be reasonably interpreted to portray that J.W.
didn't start to walk away until the very moment when Gallegos
attacked Shing. In other words, J.W. was still in very close

proximity to Shing when Gallegos struck him. From this, the jury could infer that Gallegos reasonably believed that J.W. remained at imminent risk of further unlawful touching by Shing at the time he acted. This inference is supported by the video footage, which shows that J.W. is still in between Gallegos and Shing when Gallegos begins to pull the wrench out of his pocket to hit Shing. Therefore, it's a reasonable inference that J.W. was within Shing's reach up until the moment Gallegos attacked him.

¶ 34     And Gallegos' testimony supports that he actually believed Shing may touch J.W. again — specifically his testimony that he was trying to protect J.W. Because J.W. was within Shing's reach, and Gallegos knew that Shing had just touched J.W., it was also a reasonable inference that Shing might touch her again without delay. Further, the evidence that Shing had touched J.W. right before Gallegos attacked him supports the giving of the defense of a third person jury instruction because "[a] defense of self[-]defense, or defense of [a third person], is usually allowed when the threat, or perceived threat of injury occurred at or near the time of the acts on which the charge is based." *Id.*

15

¶ 35    The People argue that there is also evidence that J.W. had already begun to walk away by the time Gallegos attacked Shing — including Gallegos' own testimony — and thus Gallegos can't argue that there was an imminent threat.  But the evidence that J.W. was already walking away doesn't negate the evidence that she was still within Shing's reach, for purposes of determining whether the requested instruction was required to be given.

¶ 36    Viewing the evidence in the light most favorable to Gallegos, we conclude that there is some credible evidence that Gallegos reasonably believed his intervention was necessary to prevent a perceived imminent threat of unlawful physical force.

c.    Evidence that Gallegos Used a Degree of Force that He Reasonably Believed to Be Necessary

¶ 37    Finally, there is some evidence in the record that Gallegos used a degree of force that he reasonably believed to be necessary. Gallegos testified that he didn't intend to hurt Shing and that he was only trying to scare him and get him to leave the bar.  Gallegos also testified that he didn't hit Shing with full force.  This testimony supports that Gallegos had the actual belief that his use of force was necessary.  Turning to the objective part of the test, it is

16

reasonable for a person to use only enough force to scare someone to stop them from engaging in unwanted sexual contact.

¶ 38     To be sure, the video footage and the injuries suffered by Shing suggest that Gallegos used more force than he testified to using.  Weighing this evidence against Gallegos' testimony, however, is the jury's role.  Here, we are only evaluating if there was *some* evidence to support giving the defense of a third person jury instruction.  Viewing this evidence in the light most favorable to Gallegos, there was some credible evidence that he used a degree of force that he reasonably believed was necessary.  Therefore, we conclude that the trial court erred when it refused to give Gallegos' requested affirmative defense instruction for the first degree assault of Shing charge.

   d.    The Error Requires Reversal of the First Degree Assault Conviction

¶ 39     Gallegos contends that the trial court's erroneous refusal to instruct the jury on his affirmative defense of a third person theory requires reversal.  We agree.

¶ 40     Had the jury been instructed on defense of a third person, the prosecution would have needed to disprove one of the elements of

17

the affirmative defense beyond a reasonable doubt. *See People v. Garcia*, 113 P.3d 775, 784 (Colo. 2005) (Colorado law dictates that once a defendant has met the burden of proof to present an affirmative defense for jury consideration, "the prosecution has the burden of disproving the claimed affirmative defense beyond a reasonable doubt."). Specifically, it would have needed to disprove at least one of the following: (1) that Gallegos acted in defense of J.W.; (2) that he did so based on a reasonable belief that Shing was using or imminently going to use unlawful physical force on J.W.; and (3) that Gallegos used a degree of force that he reasonably believed to be necessary for that purpose. *See* § 18-1-704(1)(a). But to disregard the failure to give the instruction as harmless, we must be convinced that there is no reasonable possibility that the court's omission of the defense of a third person instruction contributed to the jury's verdict finding Gallegos guilty of first degree assault against Shing. *See Hagos*, ¶ 11. We can't get there.

¶ 41    The evidence could reasonably have supported the inference that when Gallegos struck Shing he was acting in defense of J.W. and that he was doing so on the basis that he reasonably believed Shing was going to imminently use unlawful physical force —

18

specifically, further unlawful sexual contact. This evidence includes Gallegos' testimony that he attacked Shing to protect J.W. and J.W.'s testimony that Shing had poked her breast right before Gallegos attacked Shing. And this isn't definitively contradicted by the video — which does show J.W. still in very close proximity to Shing when Gallegos initiated the attack.

¶ 42    The element that presents the closest call is whether Gallegos used a degree of force that he reasonably believed to be necessary for such a purpose. To be sure, there is a strong case to be made that the use of the wrench wasn't reasonable — and that Gallegos didn't believe otherwise. But as discussed above, there is conflicting evidence on this point. Indeed, Gallegos testified that he wasn't trying to hurt Shing but, instead, was trying to "scare him" and get him out of the bar.

¶ 43    The People argue that the error was harmless because Gallegos' use of force was objectively unreasonable. Specifically, the People argue that because Gallegos testified that he didn't see Shing touch J.W., and the video doesn't clearly show the contact, Gallegos' jump to violence cannot be reasonable. But the People's interpretation ignores Gallegos' testimony that he believed Shing

19

"groped" J.W., the video showing that J.W. was still within proximity of Shing when Gallegos initiated the attack, and Gallegos' testimony that he wasn't trying to hurt Shing.

¶ 44    Simply put, while this may not have been the strongest defense of a third person case, we also can't say with the requisite confidence that the jury would have rejected the defense if properly instructed. To conclude that the error was harmless beyond a reasonable doubt, we have to be able to say that the verdict rendered "was surely unattributable to the error." *People v. Mendenhall*, 2015 COA 107M, ¶ 49 (quoting *Blecha v. People*, 962 P.2d 931, 942 (Colo. 1998)). Because of the conflicting evidence, we can't reach this conclusion. Accordingly, the People have not proved that the instructional error was harmless beyond a reasonable doubt; therefore, reversal is required on Gallegos' first degree assault conviction.

e.    The Error Requires Reversal of Gallegos' Remaining Convictions

¶ 45    Gallegos contends that the trial court's failure to instruct the jury on his defense of a third person theory for the first degree assault conviction also requires reversal of his remaining

20

convictions, despite not being an affirmative defense available to those charges. Specifically, he argues that defense of a third person is an elemental traverse for the reckless endangerment of Shing charge. For the second degree assault and reckless endangerment of McDermott charges, Gallegos argues that the jury didn't have all the necessary information about how the fight started with Shing, so it couldn't properly evaluate his defenses against these charges. The People argue that because the jury was instructed to consider each count as a separately charged and distinct offense, an error in one of the convictions can't lead to an error in the others. The People further argue that the jury's rejection of Gallegos' self-defense affirmative defense for the charges concerning Gallegos' conduct toward McDermott proves that the jury couldn't find Gallegos' conduct reasonable — even if it had been instructed on a defense of a third person affirmative defense for Gallegos' conduct toward Shing. We agree with Gallegos.

¶ 46    Defense of a third person isn't an affirmative defense available for the crimes of recklessness because it is impossible for a person to act justifiably — as a theory of defense of a third person requires — and also act with a conscious disregard of unjustifiable

21

risk — as recklessness requires. *See People v. Luna*, 2020 COA 123M, ¶ 11. Instead, defense of a third person acts as an elemental traverse for crimes of recklessness. *Id.* Gallegos didn't request a defense of a third person affirmative defense for the second degree assault of McDermott charge. Accordingly, the trial court's error of not instructing the jury on defense of a third person didn't implicate Gallegos' constitutional rights in regards to the second degree assault or either of the reckless endangerment charges.

¶ 47 We review nonconstitutional trial errors that were preserved for harmless error, and we only reverse if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos*, ¶ 12 (citation omitted).

¶ 48 Because the jury wasn't instructed on defense of a third person, it didn't have all the necessary information to determine if Gallegos' acted recklessly toward Shing. There is a reasonable possibility that if the jury had been given the instruction, it could have found that he didn't act recklessly, but was instead justified in his actions. Therefore, the error substantially influenced the reckless endangerment of Shing verdict and it must be reversed.

¶ 49 Turning to the charges for Gallegos' conduct toward McDermott, the jury similarly didn't have all the necessary information to reach a fair verdict on these charges either. Indeed, the jury rejected Gallegos' theory of self-defense for both the second degree assault charge and the reckless endangerment charge. The self-defense instruction, however, included language about the initial aggressor exception. Therefore, it's possible that the jury rejected Gallegos' self-defense theory based on its perception that he was the initial aggressor. Had the jury been properly instructed on Gallegos' defense of a third person theory for his attack on Shing, the jury could well have determined that he wasn't the initial aggressor and was properly defending himself against McDermott.

¶ 50 Accordingly, the trial court's error in refusing to instruct the jury on the defense of a third person affirmative defense substantially affected all of the verdicts, and thus they must all be reversed.

### B. Gallegos' Remaining Arguments

¶ 51 Because we reverse based on the trial court's refusal to instruct the jury on Gallegos' defense of a third person affirmative defense and Gallegos' remaining arguments aren't likely to arise in

the same posture on remand, we don't reach the merits of the remaining arguments.

## III.   Disposition

¶ 52    For the reasons set forth above, we reverse the judgment of conviction and remand the case to the trial court for a new trial.

JUDGE SCHOCK and JUDGE LUM concur.